UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

—————

DAVID K. HUTCHESON,

               Plaintiff,                   Case No. 1:13-cv-1174

v.                                         Honorable Paul L. Maloney

GENERAL MOTORS CORP/LLC et al.,

               Defendants.

_____/

## OPINION

        This is a civil rights action brought by a state prisoner pursuant to the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.*, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1), and the United States Constitution. The Court has granted Plaintiff leave to proceed *in forma pauperis*, and Plaintiff has paid the initial partial filing fee. Under the Prison Litigation Reform Act, PUB. L. NO. 104-134, 110 STAT. 1321 (1996), the Court is required to dismiss any prisoner action brought under federal law if the complaint is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant immune from such relief. 28 U.S.C. § 1915(e)(2). The Court must read Plaintiff's *pro se* complaint indulgently, *see Haines v. Kerner*, 404 U.S. 519, 520 (1972), and accept Plaintiff's allegations as true, unless they are clearly irrational or wholly incredible. *Denton v. Hernandez*, 504 U.S. 25, 33 (1992). Applying these standards, Plaintiff's action will be dismissed for failure to state a claim.

**Factual Allegations**

Plaintiff David K. Hutcheson is a state prisoner incarcerated by the Michigan Department of Corrections at the Gus Harrison Correctional Facility.  Defendants are identified in the complaint as:  GENERAL MOTORS CORP/LLC ("GM"); GENERAL MOTORS DELTA TOWNSHIP ASSEMBLY PLANT CORP/LLC ("Delta"); GENERAL MOTORS GRAND RIVER OF LANSING ASSEMBLY PLANT ("LGR"); GENERAL MOTORS STAMPING PLANT OF LANSING ("SPL"); UNITED AUTOWORKERS UNION LOCAL 602 ("UAW 602"), an entity whose members are employed by Delta; UNITED AUTOWORKERS UNION LOCAL 652 ("UAW 652"), an entity whose members are employed by LGR; and James Whinnie, the "Administrator for Delta Township Facebook Social Media Website." (Compl., docket #1, Page ID#5.) Defendant GM is located in Detroit, Michigan.  The other Defendants are located in Lansing, Michigan.

Plaintiff alleges that he was hired by GM to work at LGR in June 2009.  He was given an entry-level position with an opportunity to increase his wages and benefits by moving from a "2 Teir [sic]" position to a "1st Teir [sic]" position.  (*Id.* at Page ID#7.)  Later that year, however, Plaintiff learned that he was going to be laid off due to a downturn in the economy.  He was terminated in November 2009, but some of his co-workers at LGR, including those with similar seniority status, were able to obtain employment at Delta.

In April 2010, Plaintiff was offered a temporary position in Lansing.  A month or two later, Plaintiff was told by his work supervisor to report to Delta for a permanent position, though it was, in fact, a temporary position.  Plaintiff worked on the assembly line at Delta for several months until he injured his back and was forced to take four weeks of sick leave.  After his leave ended, Delta medical staff cleared Plaintiff for work and he reported back to his position on the

assembly line.  Three hours later, however, a security team told Plaintiff to collect his property and prepare to be escorted off the property.  Plaintiff asked to see a "shop commit[t]ee man" and he was able to speak with a representative of UAW 602, who told Plaintiff that he had no rights.  (Compl., docket #1, Page ID#9.)

Plaintiff subsequently reported what had happened to him to UAW 652.  He was then given a position at the stamping plant in Lansing (SPL).  Plaintiff worked in that position for a period of time, and he was paid wages consistent with a "permanent" position.  (*Id.* at Page ID#9.) In November 2010, Plaintiff passed out after giving blood at a blood drive.  He was taken to a hospital, where he learned that he had "abnormal heart reports."  (*Id.* at Page ID#9.)  He was told by medical staff to follow-up with a physician.  The following day, Plaintiff reported to work and requested to speak with a representative of his employer's "Employee Assistance Program" ("EAP").  (*Id.* at Page ID#10.)

In December 2010, Plaintiff "came to terms" with an EAP representative and his work supervisors regarding a drug addiction.  (*Id.*)  He then went on "temporary disability/sick leave" to enter a drug rehabilitation program.  (*Id.*)

After Plaintiff completed the drug rehabilitation program, he was told that his position was only a temporary one and that he would have to return $7,000 in pay and would be placed on "2 Teir" status.  (*Id.*)  Plaintiff continued working for a period of time, slowly paying back the money he owed; however, he was forced to declare bankruptcy.  He lost his home and was forced to sleep wherever he could, sometimes in his vehicle.  Representatives of UAW 601 and UAW 652 occasionally gave him a place to sleep or a loan to purchase food.  Eventually, he

informed his employer that he was unable to continue working because of "disabilities." (*Id.*) He was then released on leave.

In the spring of 2011, Plaintiff was called back to Delta, where he was given a position in the body shop. Several months later, Plaintiff reported that he was not feeling well. He then spoke with an EAP representative about "mental disabilities, [and] addiction/recovery issues." (*Id.* at Page ID#11.) The representative was "understanding" and offered him advice. (*Id.*)

That fall, Delta started a process of eliminating some of its employees. Meanwhile, Plaintiff's manager attempted to move him to a different area within the body shop, but Plaintiff worked with a member of UAW 602 to prevent that from happening. Approximately one month later, however, Plaintiff learned that he was going to be laid off.

After he learned that he was going to lose his job, Plaintiff recorded a video of himself and posted it to his Facebook account. In the video, he "demanded/request[ed] that [the] Union, and H.R./Management sit down with [him], to discuss the facts of having seniority rights and contract[ual] obligations." (*Id.* at Page ID#11.) Plaintiff was a member of Delta's internal networking website at the time, and the video ended up on that site. Plaintiff claims that Defendant Whinnie allowed "a contin[u]ous thread" of the video on Delta's website. (*Id.* at Page ID#5.)

The following day, Plaintiff faced a "hostile environment" at his workplace, with his "video and criminal background report being passed around the plant, in ridicule." (*Id.* at Page ID#11.) Delta management allegedly called Plaintiff's parole officer and his stepfather, suggesting that Plaintiff might be "homicidal and/or suicidal." (*Id.* at Page ID#12.) Within a few hours of his arrival at work, Plaintiff was escorted off of Delta's property.

- 4 -

Based on the foregoing, Plaintiff asserts six different "counts" or claims for relief. In Count One of the complaint, Plaintiff claims that Defendant Delta violated the ADA by discriminating against him and failing to accommodate him, resulting in his discharge.  Plaintiff contends that Delta "was or should have been aware" of Plaintiff's "previous disabilities" because he went on "sick leave/disability" for a back injury, and that it should not have terminated him after he requested a "mandatory" "interactive process."  (*Id.* at Page ID##3-4.)  In Count Two, Plaintiff claims that Defendants GM and Delta violated the "Hostile Work Environment standards of" of "Title VII" by allowing harassment "so severe or pervasive" that it created an "abusive working environment."  (*Id.* at Page ID#14.)  In Count Three, Plaintiff claims that Defendant Delta violated "Article I of the United States Constitution."  (*See id.* at Page ID#15.)  In Count Four, Plaintiff claims that GM and the other GM-related Defendants discriminated against him "with respect to his compensation, terms, conditions, or privileges of employment," thereby violating "Title VII."  (*Id.*)  In Count Five, Plaintiff claims that unidentified Defendants violated the ADA because he suffers from a disability, he was subjected to an "adverse employment action," and "he was replaced by a non-disabled person or treated less favorably than [a] non-disabled employee."  (*Id.*)  In Count Six, Plaintiff claims that unidentified Defendants discriminated against him in violation of the ADA by refusing to train him "on certain equipment [for which he] was qualified[.]" (*Id.* at Page ID#16.)

In another section of the complaint, Plaintiff contends that Defendant Delta's decision to terminate him in the summer of 2010 "impaired [his] contract of permanent employment" and violated unidentified collective bargaining agreements.  (*Id.* at Page ID#4.)  Finally, he claims that Defendant Whinnie's actions allowed a hostile work environment, which caused "emotional pain,

suffering, inconven[ien]ce, mental anguish, loss of enjoyment of life and other nonpecuniary losses." (*Id.* at Page ID#5.)

As relief, Plaintiff seeks "front pay, back pay, reinstatement, damages or special accom[mo]dations," as well as other compensatory and punitive damages, and a declaratory judgment that his employer violated the ADA "and other Constitutional laws." (*Id.* at Page ID#17.)

## Discussion

A complaint may be dismissed for failure to state a claim if it fails "'to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions. *Twombly*, 550 U.S. at 555; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). The court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 679. Although the plausibility standard is not equivalent to a "'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (quoting FED. R. CIV. P. 8(a)(2)); *see also Hill v. Lappin*, 630 F.3d 468, 470-71 (6th Cir. 2010) (holding that the *Twombly/Iqbal* plausibility

standard applies to dismissals of prisoner cases on initial review under 28 U.S.C. §§ 1915A(b)(1) and 1915(e)(2)(B)(I)).

### A. ADA

In Counts One, Five and Six, Plaintiff claims that various Defendants violated the ADA.  To make out a prima facie case of unlawful discrimination under the ADA, Plaintiff must show:  (1) he was disabled; (2) he was qualified to perform the essential functions of a position; (3) he suffered an adverse employment action; (4) his employer knew or had reason to know of his disability; and (5) either the position remained open or a non-disabled person replaced him. *Gecewicz v. Henry Ford Hosp.*, 683 F.3d 316, 321 (6th Cir. 2012).  An individual is qualified if he "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  42 U.S.C. § 12111(8).

### 1.  Termination by LGR in 2009

Plaintiff alleges that he was laid off by LGR in November 2009 due to a downturn in the economy.  These allegations do not state an ADA claim, as Plaintiff does not allege that he was disabled or that LGR terminated him for that reason.

### 2.  Termination by Delta in 2010

Plaintiff claims that Defendant Delta terminated him in the summer of 2010 after he returned to work following a month's leave for a back injury.  These allegations are also insufficient to state an ADA claim, because Plaintiff does not allege that he was disabled.  The ADA provides three avenues for a plaintiff to show that he is disabled.  The term "disability" means:

> (A) a physical or mental impairment that substantially limits one or more major life activities of such individual;
>
> (B) a record of such an impairment; or

> (C) being regarded as having such an impairment (as described in paragraph (3)).

42 U.S.C. § 12102(1).

Plaintiff does not allege that he was physically or mentally impaired when he returned to work. To the contrary, he claims that Delta's medical staff cleared him for work. Furthermore, he cannot rely on paragraph (1)(C) to claim that Delta "regarded" him as having an impairment. 42 U.S.C. § 12102(3) provides that "Paragraph (1)(C) shall not apply to impairments that are transitory and minor. A transitory impairment is an impairment with an actual or expected duration of 6 months or less." 42 U.S.C. § 12102(3)(B). Plaintiff alleges a back injury that lasted for approximately one month. Consequently, paragraph (1)(C) does not apply. *See Gecewicz v. Henry Ford Macomb Hosp. Corp.*, 683 F.3d 316, 322 (6th Cir. 2012). Moreover, none of Plaintiff's allegations indicate that Delta regarded him as having a long-term impairment, or terminated him for that reason. *See id.* (dismissing ADA claim because "none of [the supervisor's] statements shows that she believed [plaintiff] had a physical or mental impairment of a duration longer than six months"). Thus, Plaintiff's allegations regarding his termination by Delta do not satisfy the first element of an ADA claim.

### 3. Return to work at SPL after drug rehabilitation

Plaintiff also contends that, while he was working for SPL in what he believed was a permanent position, he passed out after giving blood at a blood drive and his doctors told him that he had "abnormal heart reports." A few months later, he went on sick leave to enter a drug rehabilitation program. When he returned from sick leave, he was told that his position was temporary rather than permanent, his pay was reduced to that of a temporary position, and he was told that he owed $7,000 because he had been overpaid. Assuming Defendant's actions constitute

an adverse employment action, rather than the correction of a prior mistake, Plaintiff nevertheless fails to satisfy the first element of an ADA claim.  He does not allege that his heart condition or his drug addiction had an impact on his work or otherwise limited a major life activity.  *See Rhoads v. Bd. of Educ. of Mad River Local Sch. Dist.*, 103 F.  App'x 888, 893 (6th Cir. 2004) ("'Drug addiction *that substantially limits one or more major life activities* is a recognized disability under the ADA.'") (quoting *Thompson v. Davis*, 295 F.3d 890, 896 (9th Cir. 2002)).  Nor does he allege that he had a record of a limiting impairment or that Defendants regarded him as being impaired.  Furthermore, as to the fifth element of an ADA claim, he does not allege that he was replaced by a non-disabled individual.  Thus, the foregoing ADA claim against SPL is wholly conclusory.

### 4.  Release by SPL

Plaintiff alleges that he was released by SPL after he told them that he could not work due to unspecified disabilities.  In this case, Plaintiff does not identify his asserted disabilities.  To the extent that he refers to his financial hardship and inability to secure permanent housing, these are not "physical or mental impairments" under the ADA.  Moreover, it appears that Plaintiff was not qualified to perform the job.  Plaintiff apparently decided for himself that he could not continue to work; he does not contend that he needed and requested a reasonable accommodation to allow him to perform his job.  Thus, he does not state a claim against SPL.

### 5.  Termination by Delta in 2011

Plaintiff asserts that Delta decided to lay him off several months after he spoke with an EAP representative about his "mental disabilities" and "addiction/recovery issues."  These allegations are too vague to state a plausible claim.  Plaintiff's brief reference to unspecified "disabilities" and "issues" fall far short of showing that he was impaired in his ability to perform a

major life activity, that he had a record of such an impairment, or that Delta regarded him as having an impairment.  *See Iqbal*, 556 U.S. at 679 ("[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint . . . has not 'show[n]' – that the pleader is entitled to relief.")  Moreover, none of Plaintiff's allegations plausibly suggest that his termination was motivated by a disability.  Consequently, they do not state an ADA claim.

### 6.  Refusal to train Plaintiff

In Count Six, Plaintiff asserts that an unidentified employer discriminated against him in violation of the ADA by refusing to train him on "certain equipment."  (Compl., docket #1, Page ID#16.)  Count Six is unsupported by any additional allegations suggesting either unlawful discrimination under the ADA, or the involvement of any of the named Defendants.  Consequently, it does not state a claim.  *See Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."); *Twombly*, 550 U.S. at 544 (holding that, in order to state a claim, a plaintiff must make sufficient allegations to give a defendant fair notice of the claim).

For the foregoing reasons, therefore, Plaintiff's ADA claim (including Counts One, Five, and Six) will be dismissed.

### B.  Title VII

In Count Two of the complaint, Plaintiff contends that Defendants violated "Title VII" by creating an "abusive work environment." (Compl., docket #1, Page ID#14.)  In Count Four, Plaintiff claims that Defendants violated Title VII by discriminating against him "with respect to his compensation, terms, conditions, or privile[g]es of employment."  (*Id.* at Page ID#15.)

Title VII of the Civil Rights Act of 1964 prohibits an employer from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). A plaintiff may establish a violation of Title VII by proving that the discrimination created a hostile or abusive work environment. *See Meritor Savings Bank v. Vinson*, 477 U.S. 57, 66 (1986); *Black v. Zaring Homes, Inc.*, 104 F.3d 822, 825 (6th Cir. 1997).

Plaintiff does not allege that Defendants' actions were motivated by his "race, color, religion, sex, or national origin." Thus, his Title VII claims (Counts Two and Four) are patently meritless.

## C. First Amendment

In Count Three of the complaint, Plaintiff claims that Defendants violated "Article I" of the Constitution, referring to rights set forth in the First Amendment:

> . . . an establishment of Religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably [sic] to assemble, and to petition the Government [for] redress of grievances.

(Compl., docket #1, Page ID#15.) The foregoing rights do not apply to conduct by Defendants. As the Sixth Circuit has explained:

> It is undisputed that First and Fourteenth Amendment protections, codified in 42 U.S.C. § 1983, are triggered only in the presence of state action and that a private entity acting on its own cannot deprive a citizen of First Amendment rights. *See, e.g., Flagg Brothers Inc. v. Brooks*, 436 U.S. 149 (1978) ("most rights secured by the Constitution are protected only against infringement by governments"); *Hudgens v. NLRB*, 424 U.S. 507 (1976) ("It is, of course, a commonplace that the constitutional guarantee of free speech is a guarantee only against abridgment by government, federal or state.").

- 11 -

*Lansing v. City of Memphis*, 202 F.3d 821, 828 (6th Cir. 2000). Defendants are private actors. They are not public officials acting on behalf of the government. Thus, Plaintiff cannot assert a First Amendment claim against them.

### D.  State Law

To the extent that Plaintiff asserts a breach-of-contract claim or another claim arising under state law, those claims will be dismissed.  In determining whether to retain jurisdiction over claims arising under state law, "[a] district court should consider the interests of judicial economy and the avoidance of multiplicity of litigation and balance those interests against needlessly deciding state law issues."  *Landefeld v. Marion Gen. Hosp., Inc.*, 994 F.2d 1178, 1182 (6th Cir. 1993). Ordinarily, where a district court has exercised jurisdiction over a state-law claim solely by virtue of supplemental jurisdiction and the federal claims are dismissed prior to trial, the court will dismiss the remaining state-law claims.  *Id.*  Dismissal, however, remains "purely discretionary."  *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009) (citing 28 U.S.C. § 1367(c)); *Orton v. Johnny's Lunch Franchise, LLC*, 668 F.3d 843, 850 (6th Cir. 2012).  Here, the balance of the relevant considerations weighs against the continued exercise of supplemental jurisdiction. Accordingly, Plaintiff's state-law claims, if any, will be dismissed without prejudice.

### Conclusion

Having conducted the review required by the Prison Litigation Reform Act, the Court determines that Plaintiff's federal claims will be dismissed for failure to state a claim pursuant to 28 U.S.C. § 1915(e)(2).  His state-law claims, if any, will be dismissed without prejudice pursuant to 28 U.S.C. § 1367(c)(3).

The Court must next decide whether an appeal of this action would be in good faith within the meaning of 28 U.S.C. § 1915(a)(3).  *See McGore v. Wrigglesworth*, 114 F.3d 601, 611 (6th Cir. 1997).  For the same reasons that the Court dismisses the action, the Court discerns no good-faith basis for an appeal.  Should Plaintiff appeal this decision, the Court will assess the $505.00 appellate filing fee pursuant to § 1915(b)(1), *see McGore*, 114 F.3d at 610-11, unless Plaintiff is barred from proceeding *in forma pauperis*, e.g., by the "three-strikes" rule of § 1915(g). If he is barred, he will be required to pay the $505.00 appellate filing fee in one lump sum.

This is a dismissal as described by 28 U.S.C. § 1915(g).

A Judgment consistent with this Opinion will be entered.


Dated:   December 20, 2013                          /s/ Paul L. Maloney
                                                    Paul L. Maloney
                                                    Chief United States District Judge

- 13 -